Kelly v. Nolan, 2022 NCBC 37.

STATE OF NORTH CAROLINA

HARNETT COUNTY

JOEL KELLY, DPM, individually
and as former partner and minority
shareholder in Piedmont Foot Clinic,
P.A.; ELIZABETH BASS
DAUGHTRY, DPM, individually and
as former partner and minority
shareholder in Piedmont Foot Clinic,
P.A., and as owner of Dunn Foot and
Ankle Center, P.A.; and DUNN
FOOT AND ANKLE CENTER, P.A.,

                    Plaintiffs,

v.

JASON NOLAN, DPM, individually
and as former partner and majority
shareholder in Piedmont Foot Clinic,
P.A.; and RICHARD HAUSER, DPM,
individually and as former partner
and majority shareholder in
Piedmont Foot Clinic, P.A.,

                    Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS 2015


**ORDER AND OPINION ON
DEFENDANTS' MOTION TO DISMISS
AMENDED COMPLAINT**


THIS MATTER comes before the Court on Defendants' Motion to Dismiss Amended Complaint. ("Motion to Dismiss," or "Motion," ECF No. 16.)

THE COURT, having considered the Motion, the briefs of the parties, the arguments of counsel, and all applicable matters of record, CONCLUDES that the Motion should be GRANTED, in part, and DENIED, in part, for the reasons set forth below.

*Timothy C. Morris, PA, by Timothy C. Morris, and the Buzzard Law Firm, by Robert A. Buzzard and Tracy A. Berry, for Plaintiffs Joel Kelly, DPM; Elizabeth B. Daughtry, DPM; and Dunn Foot and Ankle Center, P.A.*

*Adams, Howell, Sizemore & Adams, P.A., by Ryan J. Adams and Jeremy Jackson, for Defendants Jason Nolan, DPM; and Richard Hauser, DPM.*

Davis, Judge.

## INTRODUCTION

1. This action involves various claims by two minority shareholders in a professional corporation against the majority shareholders of the company. With regard to the present motion, the Court must determine whether Plaintiffs' claims in their Amended Complaint (ECF No. 11) are subject to dismissal for lack of standing pursuant to Rule 12(b)(1) of the North Carolina Rules of Civil Procedure and for failure to state a claim upon which relief can be granted based on Rule 12(b)(6).

2. The Court notes that its job has been made more difficult by the fact that the Amended Complaint at times fails to specify which claims are being asserted on behalf of which of the named Plaintiffs. Similarly, throughout the Amended Complaint, the two Defendants—Jason Nolan and Richard Hauser—are referred to generically as "Defendants" without any attempt made to differentiate between them as to the acts alleged therein.

## FACTUAL AND PROCEDURAL BACKGROUND

3. The Court does not make findings of fact on motions to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure and instead recites pertinent facts contained in Plaintiffs' Amended Complaint and in documents attached to, referred to, or incorporated by reference in the Amended Complaint that are relevant to the Court's determination of the Motion.

4. Plaintiffs Joel Kelly and Elizabeth Bass Daughtry (collectively, the "Individual Plaintiffs"), along with Defendants Nolan and Hauser (collectively,

"Defendants")—all physicians of podiatric medicine—were shareholders in a professional corporation, Piedmont Foot Clinic, P.A. ("Piedmont"), from 1 January 2017 until 28 February 2020.[1] In 2020, Piedmont was sold to U.S. Foot and Ankle Specialists, LLC ("USFAS"), Foot and Ankle Specialists of the Mid-Atlantic, LLC ("FASMA"), and U.S. Foot and Ankle Specialists Holdings, LLC ("USFASH").[2] (ECF No. 3, at ¶¶ 1–6, 10–12, 35.)

5.      Kelly and Daughtry were each ten percent (10%) shareholders of Piedmont.[3]  (*Id.* at ¶¶ 17, 19–20.)  Defendants—Nolan and Hauser—owned the remaining eighty percent (80%) interest in Piedmont, each owning forty percent (40%) of the total shares.  (*Id.* at ¶ 18.)  Nolan served as Vice President and Secretary of Piedmont, and Hauser served as President and Treasurer.  (*Id.* at ¶ 37.)

6.      Generally, the Amended Complaint alleges that since January 2017, Defendants Nolan and Hauser have conspired and engaged in various wrongful conduct toward the Individual Plaintiffs.  (*Id.* at ¶ 67.)  These alleged wrongful acts relate to three topics: (a) Piedmont's use and subsequent sale of equipment belonging to a separate entity, Plaintiff Dunn Foot and Ankle Center, P.A. ("Dunn Foot") that was owned by Daughtry; (b) the allocation among the Shareholders of certain disputed expenses of Piedmont; and (c) certain issues relating to the proceeds of the

---

[1] Throughout this Opinion, Kelly, Daughtry, Nolan, and Hauser are at times referred to collectively as the "Shareholders."

[2] USFAS, FASMA, and USFASH are not parties to this lawsuit.

[3] Prior to becoming shareholders of Piedmont, Kelly and Daughtry worked for Piedmont as associates.  (ECF No. 3, at ¶¶ 19–20.)

sale of Piedmont. Plaintiffs' allegations pertaining to these topics are set out more fully below.

7. Prior to joining Piedmont, Daughtry was the sole owner of Dunn Foot. (*Id*. at ¶ 20.) Piedmont acquired Dunn Foot in 2015, after which Daughtry began working for Piedmont as an associate. (*Id*. at ¶¶ 21, 24.)

8. As part of her practice at Dunn Foot, Daughtry "owned all the equipment necessary to practice podiatric medicine including a client management system, charts, and equipment, including five (5) podiatry exam tables and chairs, a casting table, all surgical equipment, an X-Ray unit and processor, and all office furniture and office supplies." (*Id*. at ¶ 25.) Plaintiffs assert that the "total value of the equipment [ ] Daughtry owned at the time Piedmont acquired her practice was approximately one hundred thousand dollars ($100,000.00)." (*Id*. at ¶ 26.)

9. Plaintiffs allege that a "Piedmont-Bass Daughtry agreement" regarding the purchase of Dunn Foot by Piedmont contained the following provision:

> [Daughtry] would begin practicing as an associate with Piedmont, and Piedmont would pay her salary as an associate, Piedmont would assume all administrative duties of the office, and *the equipment would remain the property of Dunn Foot until she was paid for them [sic] by Piedmont* while [ ] Daughtry personally assumed any personal debt associated with Dunn Foot in addition to making personal payments for access to Dunn Foot [ ] to maintain records at a personal cost to [ ] Daughtry of two hundred fourteen dollars ($214.00) per month.

(*Id*. at ¶ 27 (emphasis added).)

10. Despite this provision, Plaintiffs allege, Daughtry has "[a]t no time prior to or after becoming a shareholder . . . [been] compensated by Piedmont for her equipment." (*Id*. at ¶ 30.) Furthermore, Plaintiffs assert that as a part of the

eventual sale of Piedmont, this equipment was listed as an asset of Piedmont. (*Id.* at ¶ 58.)

11.    Plaintiffs also allege the existence of an agreement between the Shareholders "that expenses would be shared equally in spite of the disparate ownership percentages and the [Shareholders] would keep the profits that they brought to the business after deducting business expenses." (*Id.* at ¶ 36.) Piedmont's bylaws "required a majority of shareholders to agree on most matters," and therefore Kelly and Daughtry—as minority shareholders—were unable "to vote [that] their expenses [ ] be proportioned according to their ownership percentage" (instead of being shared equally among the Shareholders). (*Id.* at ¶ 38.)

12.    Consequently, from 2017 through 2020, Kelly and Daughtry were required to share equally in certain expenses that they contend were not valid business expenses of Piedmont. (*Id.* at ¶¶ 39–52.) These expenses included: salaries and benefits paid by Piedmont to Defendants' family members despite the fact that these family members did not perform any work for Piedmont (*id.* at ¶¶ 39–52); Nolan's purchase of season tickets to the Carolina Hurricanes for the 2018–2020 seasons, which Plaintiffs allege were solely for Nolan's personal use (*id.* at ¶ 54); "fraudulently inflated . . . fees for physician licensing and dues, continued medical education fees, accounting fees, and advertising fees" (*id.* at ¶ 55); and "doctor management fees and staff management fees" that Defendants paid to themselves. (*id.* at ¶ 56).

13.     For example, in 2019, Plaintiffs allege that

> without the knowledge or consent of the [Individual Plaintiffs], [ ] Nolan's spouse was paid a salary of two hundred forty-five thousand dollars ($245,000.00) and received a 401K contribution of nineteen thousand dollars ($19,000.00) from Piedmont as an employee despite not performing any work for the practice during said period, while said expenses were shared equally by [the Individual Plaintiffs] as part of the total employee expenses despite said expense not being a valid business expense.

> [W]ithout the knowledge or consent of the [Individual Plaintiffs], [ ] Nolan's son was paid a salary of nineteen thousand nine hundred ninety-five dollars ($19,995.00) from Piedmont despite not doing any actual work for the practice, and said expense was shared equally by [the Individual Plaintiffs] as part of the total employee expenses despite said expense not being a valid business expense.

> [W]ithout the knowledge or consent of the [Individual Plaintiffs], [ ] Hauser's spouse was paid a salary of one hundred sixty thousand three hundred ninety-five dollars ($160,395.000), received a 401K contribution of twenty-five thousand dollars ($25,000), and was provided a dental insurance coverage contribution of one thousand five hundred nine dollars and four cents ($1,509.04), received a health savings account contribution of seven thousand eight hundred dollars ($7,800.00), received a medical insurance contribution of eleven thousand six hundred eighty-eight dollars and fifty-six cents ($11,688.56); and received a vision insurance contribution of two hundred thirty dollars and thirty-six cents ($230.36) from Piedmont despite not doing any work for the practice during said period, while said expenses were shared equally by [the Individual Plaintiffs] as part of the total employee expense despite said expense not being a valid business expense.

(*Id*. at ¶¶ 46–48.)

14.     In 2017, Nolan and Hauser bought out another existing shareholder of Piedmont, Robert Lenfesty.  (*Id*. at ¶¶ 21, 29.)   The Shareholders all agreed to be equally liable on a loan taken out to facilitate this buy-out in the amount of $1,146,334.26.  (*Id*. at ¶ 32.)  The "note [was] paid in full as of the date of" the sale of

Piedmont on 28 February 2020. (*Id.* at ¶¶ 32–33.) The Individual Plaintiffs allege that they "bore an equal share" of this debt "in spite of only owning ten percent [ ] respectively in Piedmont." (*Id.* at ¶ 34.)

15. On 28 February 2020, Piedmont was sold to USFAS, FASMA, and USFASH. (*Id.* at ¶ 58.) Plaintiffs allege that after Piedmont was sold, "[D]efendants refused to divide the proceeds of the sale pursuant to each member's respective percentage of shares[.]" (*Id.* at ¶ 59.)

16. Plaintiffs filed an original Complaint in this action on 23 September 2021. (ECF No. 3.) On 29 October 2021, this case was designated a mandatory complex business case and assigned to the undersigned. (ECF Nos. 1, 2.)

17. On 20 December 2021, Plaintiffs filed an Amended Complaint. (ECF No. 11.) The Amended Complaint contains seven claims against Defendants: (1) breach of the covenant of good faith and fair dealing; (2) civil conspiracy; (3) breach of contract; (4) conversion; (5) breach of fiduciary duty; (6) unfair and deceptive trade practices ("UDTP"); and (7) fraud. (*Id.* at ¶¶ 72–110.)

18. On 19 January 2022, Defendants filed the present Motion to Dismiss as to all claims asserted in the Amended Complaint. (ECF No. 16.)

19. The Court held a hearing on the Motion to Dismiss on 5 May 2022. The Motion is now ripe for decision.

## LEGAL STANDARD

20. "Standing is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction." *In re A.S.M.R.*, 375 N.C. 539, 542 (2020) (cleaned up).

Rule 12(b)(1) requires the dismissal of any action "based upon a trial court's lack of jurisdiction over the subject matter of the claim." N.C. R. Civ. P. 12(b)(1).[4] The plaintiff bears the burden of establishing subject matter jurisdiction. *See Harper v. City of Asheville*, 160 N.C. App. 209, 217 (2003). In ruling on a motion to dismiss for lack of standing pursuant to Rule 12(b)(1), the Court "may consider matters outside the pleadings" in determining whether subject matter jurisdiction exists, *Harris v. Matthews*, 361 N.C. 265, 271 (2007), and must "view the allegations [of the complaint] as true and the supporting record in the light most favorable to the non-moving party[,]" *Mangum v. Raleigh Bd. of Adjustment*, 362 N.C. 640, 644 (2008).

21. "A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint by presenting the question whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief can be granted under some recognized legal theory." *Forsyth Mem'l Hosp., Inc. v. Armstrong World Indus., Inc.*, 336 N.C. 438, 442 (1994) (cleaned up). In ruling on a motion to dismiss under Rule 12(b)(6), the Court may only consider the complaint and any "documents attached, specifically referred to, or incorporated by reference in the complaint," *Laster v. Francis*, 199 N.C. App. 572, 577 (2009); *see also Moch v. A.M. Pappas & Assocs., LLC*, 251 N.C. App. 198, 206 (2016); *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60 (2001), and must view the allegations in the complaint "in the light most favorable to the non-moving party[,]" *Christenbury Eye Ctr., P.A. v.*

---

[4] The Court notes that "[a] plaintiff's standing to assert its claims may be challenged under either Rule 12(b)(1) or Rule 12(b)(6)[.]" *Raja v. Patel*, 2017 NCBC LEXIS 25, at *11 (N.C. Super. Ct. Mar. 23, 2017).

*Medflow, Inc.*, 370 N.C. 1, 5 (2017) (citation omitted). "It is well-established that dismissal pursuant to Rule 12(b)(6) is proper when (1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (cleaned up).

## ANALYSIS

22.     At the outset, the Court notes that following the filing of Defendants' Motion to Dismiss, Plaintiffs filed a notice stating that "Plaintiffs hereby voluntarily dismiss only the derivative claim pursuant to Rule 41(a) of the North Carolina Rules of Civil Procedure without prejudice." (ECF No. 25.)  Although the caption of the Amended Complaint lists Piedmont as both an additional plaintiff and as a nominal defendant, the Court observes that the Amended Complaint does not state which claim(s) were intended to be asserted derivatively.  In any event, the parties agreed at the 5 May 2022 hearing that, as a result of the voluntary dismissal, no derivative claims currently exist.[5]  Therefore, to the extent Defendants' Motion to Dismiss seeks dismissal of any derivative claims asserted by Plaintiffs, the Motion is DENIED as MOOT.

---

[5] Accordingly, the Court has amended the case caption to reflect the absence of any derivative claims.  The parties are directed to use this new caption going forward on all future filings unless any new amended complaint filed by Plaintiffs necessitates additional changes to the caption.

## A. Breach of Fiduciary Duty

23. Defendants' argument based on lack of standing is directed toward Plaintiffs' claim for breach of fiduciary duty against Nolan and Hauser as majority shareholders and officers of Piedmont. (ECF No. 11, at ¶¶ 96–100.) Accordingly, the Court will address this argument first.

24. In this claim, Plaintiffs assert that "Defendants owed a fiduciary duty to Plaintiffs" and breached said fiduciary duties by "embezzl[ing] [ ] business funds for their own personal use"; "[p]aying their family members a yearly salary and benefits despite them not actually working for Piedmont"; "[f]orcing Plaintiff[s] to equally share in [ ] fraudulent business expenses"; "[s]elling . . . Daughtry's equipment"; "not paying the minority [shareholders] their fair share of the proceeds from the sale of Piedmont"; and "paying themselves management fees . . . without the knowledge and consent of Plaintiffs." (ECF No. 11, at ¶¶ 98–99.)

25. It is well-settled that "[t]o establish a claim for breach of fiduciary duty, a plaintiff must show that: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of the injury to the plaintiff." Thus, "to make out a claim for breach of a fiduciary duty, plaintiffs must first allege facts that, taken as true, demonstrate that a fiduciary relationship existed between the parties." *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 339–40 (2019).

26. Defendants contend that Plaintiffs' breach of fiduciary duty claim should be dismissed pursuant to Rule 12(b)(1) because "caselaw dictates that breach

of fiduciary duty claims should be brought as derivative claims" rather than individual claims. (ECF No. 17, at p. 14.) Defendants appear to be basing this argument on the body of case law in North Carolina generally requiring claims by shareholders alleging harm to the corporation itself to be brought derivatively. *See, e.g.*, *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 660 (1997) (explaining that corporate shareholders "generally may not bring individual actions to recover what they consider their share of the damages suffered by the corporation").

27. In *Barger*, however, our Supreme Court set out two exceptions to the general rule:

> (1) where there is a special duty, such as a contractual duty, between the wrongdoer and the shareholder, and (2) where the shareholder suffered injury separate and distinct from that suffered by other shareholders.

346 N.C. at 658.

28. One such "special duty" that our appellate courts have recognized is the fiduciary duty owed by majority shareholders to minority shareholders in close corporations. *See Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 407 (2000) ("[O]ur cases have consistently held that majority shareholders in a close corporation owe a 'special duty' and obligation of good faith to minority shareholders."); *see also Raymond James Capital Partners, L.P. v. Hayes*, 248 N.C. App. 574, 579–80 (2016) ("[A] controlling shareholder owes a fiduciary duty to minority shareholders" and "a special duty exists when a party violates its fiduciary duties to the shareholder"). To that end, North Carolina courts have allowed minority shareholders to bring individual claims against majority shareholders for breach of

their fiduciary duties even where a derivative action would otherwise have been appropriate. *See, e.g.*, *Norman*, 140 N.C. App. at 406–08 ("[W]e hold that under the circumstances of this case, the plaintiff minority shareholders . . . may maintain their individual actions against the majority shareholders . . . , including the allegation of diversion of corporate assets and opportunities.").

29. Moreover, this Court has recognized that such a fiduciary duty can arise where two shareholders—each lacking a majority ownership interest on their own— act together to form a majority interest *collectively* at the expense of other minority shareholders:

> Corporate shareholders generally do not owe a fiduciary duty to one another. *See Freese v. Smith*, 110 N.C. App. 28, 37 [ . . . ] (1993). But there is an exception: a controlling shareholder owes a fiduciary duty to protect the interest of minority shareholders. *Gaines v. Long Mfg. Co.*, 234 N.C. 340, 344–45 [ . . . ] (1951). Typically, a controlling shareholder is a majority shareholder *(or a group of shareholders with an aggregate majority interest acting in concert)*. *See id.* at 345 [ . . . ] (citing *S. Pac. Co. v. Bogart*, 250 U.S. 483, 487–88 [ . . . ] (1919); *Loy v. Lorm Corp.*, 52 N.C. App. 428, 432 [ . . . ] (1981).

*Brewster v. Powell Bail Bonding, Inc.*, 2018 NCBC LEXIS 76, at *10 (N.C. Super. Ct. July 26, 2018) (emphasis added); *see also Flynn v. Pierce*, 2020 NCBC LEXIS 149, at **10–11 (N.C. Super. Ct. Dec. 22, 2020) (allowing minority shareholders to pursue claims against shareholders who *collectively* owned 98% of the corporation's shares).

30. Here, Plaintiffs have alleged that Nolan and Hauser together owned 80% of Piedmont's shares. Moreover, they have also asserted that Nolan and Hauser (a) served as the sole officers of Piedmont; (b) possessed "complete control" over

Piedmont; and (c) conspired to breach their fiduciary duties to Kelly and Daughtry. (ECF No. 11, at ¶¶ 18, 37, 39–53.)

31.     The Court concludes that these assertions sufficiently allege the existence of a fiduciary duty for purposes of Plaintiffs' individual claim for breach of fiduciary duty against Nolan and Hauser.

32.     Therefore, Defendants' Motion to Dismiss based on Rule 12(b)(1) is DENIED with regard to Plaintiffs' claim for breach of fiduciary duty.

**B.     Breach of Contract**

33.      Plaintiffs have also alleged a claim for breach of contract against Nolan and Hauser.  (ECF No. 11, at ¶¶ 84–90.)  To state a claim for breach of contract, the complaint must allege "(1) the existence of a contract between plaintiff and defendant, (2) the specific provisions breached, (3) the facts constituting the breach, and (4) the amount of damages resulting to plaintiff from such breach."  *Intersal, Inc. v. Hamilton*, 373 N.C. 89, 109 (2019) (cleaned up).

34.     Although no contract was attached to Plaintiffs' Amended Complaint, it is clear that the document Plaintiffs are relying upon with regard to this claim is the Shareholder Agreement for Piedmont.  ("Shareholder Agreement," ECF No. 17, at pp. 52–73.)  Because the Shareholder Agreement is referred to (and quoted in part) in the Amended Complaint, the Court is allowed to consider this document, which is attached to Defendants' brief in support of their Motion to Dismiss.  *See Oberlin*, 147 N.C. App. at 60 (stating that the "court may properly consider documents which are

the subject of plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant").[6]

35.     The specific provision within the Shareholder Agreement that serves as the basis for Plaintiffs' breach of contract claim is Section C of the "Recitals" section at the beginning of the document, which states as follows:

> The parties hereto desire and intend, among other things, to provide for the ongoing rights of the Shareholders and future disposition of the Shares, to encourage the harmonious and successful management and control of the Corporation and to prevent interference with the orderly conduct of the business of the Corporation, and do hereby execute this Agreement for such purposes.

("Section C," ECF No. 17, at p. 52.)

36.     Defendants contend that the breach of contract claim should be dismissed because (a) Section C "creates no duties and requires no performance"; and (b) Plaintiffs have failed to allege a breach of any term in the Shareholder Agreement. (ECF No. 17, at p. 10.)

37.     Plaintiffs allege that Nolan and Hauser have breached Section C by engaging in the following conduct: "fraudulent and wrongful business deductions"; "paying their family members a yearly salary and benefits despite them not actually working for Piedmont"; "forcing Plaintiffs to equally share in [ ] fraudulent business expenses"; "selling Plaintiff [ ] Daughtry's equipment"; "intentionally not paying [Plaintiffs] their fair share of the proceeds from the sale of Piedmont"; "pa[ying] themselves management fees . . . without the knowledge and consent of Plaintiffs";

---

[6] At the 5 May 2022 hearing, the parties agreed that the Court can properly consider the Shareholder Agreement in deciding the present Motion.

"t[aking] actions and m[aking] decisions without holding the appropriate meetings with the other shareholders"; and "caus[ing] discord between the Shareholders and prevent[ing] the successful management of Piedmont[.]" (ECF No. 11, at ¶¶ 86(a)–(i).)

38. The fatal defect in Plaintiffs' argument is that Section C does not contain any actual contractual obligations sufficient to form the basis for a breach of contract claim. Instead, it is merely a recital as to the overall purpose of the Shareholder Agreement. Moreover, Plaintiffs have failed to point to any other specific provisions of the Shareholder Agreement that would support Plaintiffs' breach of contract claim. At the hearing, Plaintiffs' counsel raised the possibility that other contracts may have existed between the parties. However, the Shareholder Agreement is the only specific contract pled in the Amended Complaint as the basis for Plaintiffs' breach of contract claim, and the Amended Complaint does not identify any other existing agreements.

39. Accordingly, the Court concludes that Defendants' Motion to Dismiss is GRANTED as to Plaintiffs' breach of contract claim, and this claim is DISMISSED without prejudice. *See Charlotte Motor Speedway, LLC v. County of Cabarrus*, 230 N.C. App. 1, 9 (2013) (affirming trial court's dismissal of breach of contract claim where complaint and documents incorporated therein "necessarily defeat" the claim).

## C. Breach of Implied Duty of Good Faith and Fair Dealing

40. Plaintiffs have also brought a claim for breach of the covenant of good faith and fair dealing. (ECF No. 11, at ¶¶ 72–76.) Under North Carolina law, every enforceable contract contains an underlying implied covenant of good faith and fair

dealing "that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 228 (1985).

> As a general proposition, where a party's claim for breach of the implied covenant of good faith and fair dealing is based upon the same acts as its claim for breach of contract, we treat the former claim as "part and parcel" of the latter." In other words, if a plaintiff brings a breach of contract claim and a claim for breach of the covenant of good faith and fair dealing based on the same facts, the two causes of action are treated as one and the same.

*Eye Dialogue LLC v. Party Reflections, Inc.*, 2020 NCBC LEXIS 90, at **19 (N.C. Super. Ct. July 28, 2020) (cleaned up) (quoting *Cordaro v. Harrington Bank, FSB*, 260 N.C. App. 26, 38–39 (2018)).

41. Accordingly, North Carolina courts have held that where a plaintiff cannot show an actual breach of a contract's express terms, it is precluded from also asserting a claim for breach of the implied covenant of good faith and fair dealing in that same contract. *See Cordaro*, 260 N.C. App. at 38–39 (holding that "the invalidity of [plaintiff's] breach of contract claim is . . . fatal to his claim for breach of the implied covenant of good faith and fair dealing" where its basis was "identical to the basis for his breach of contract claim"); *Eye Dialogue LLC*, 2020 NCBC LEXIS 90 at **20–21 (dismissing breach of contract claim and, therefore, also dismissing claim for breach of the implied covenant of good faith and fair dealing to the extent it was "supported by the same factual underpinnings"); *see also Suntrust Bank v. Bryant/Sutphin Props., LLC*, 222 N.C. App. 821, 833 (2012) ("As the jury determined that plaintiff did

not breach any of its contracts with defendants, it would be illogical for this Court to conclude that plaintiff somehow breached implied terms of the same contracts.").

42.     Here, the basis for Plaintiffs' claim that Nolan and Hauser breached the implied covenant of good faith and fair dealing is identical to the basis for their breach of contract claim, which the Court has dismissed.  Accordingly, as in *Suntrust Bank,* it would be "illogical" to find that Plaintiffs have adequately alleged a breach of *implied* terms in that same contract.  *See* 222 N.C. App. at 833.  Therefore, Defendants' Motion to Dismiss is GRANTED as to Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing, and this claim is DISMISSED without prejudice.

### D.     Conversion

43.      In addition, the Amended Complaint contains a claim for conversion in which Plaintiffs allege that "Defendants converted the income and profits from Piedmont . . . and the equipment of Dunn Foot[.]"  (ECF No. 11, at ¶¶ 91–95.)[7]

44.     Our Supreme Court has stated that "the tort of conversion is well defined as an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights."  *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523 (2012) (cleaned up).  "There are, in effect, two essential elements of a conversion claim: ownership in the plaintiff and wrongful

---

[7] As noted above, Dunn Foot is also named as a Plaintiff in this case.  Presumably, the conversion claim (that is, the portion of the claim alleging the conversion of equipment owned by Dunn Foot) is the only claim in the Amended Complaint asserted on behalf of Dunn Foot.

possession or conversion by the defendant." *Id.* (citing *Gadson v. Toney*, 69 N.C. App. 244, 246 (1984)).

45.    In the Amended Complaint, Plaintiffs allege, in part, the following:

At all times that Plaintiffs were owners and shareholders of Piedmont, they were entitled to, and the lawful owners of their income and profits of Piedmont, and Plaintiff [ ] Daughtry, as the owner of Dunn Foot, was the established and known owner of the equipment that came from the Dunn Foot Office.

Defendants converted the income and profits from Piedmont, the lawful property of the Plaintiffs, and the equipment of Dunn Foot through fraud, deception, misrepresentations, and by refusing to return or pay for the property upon the request of Plaintiffs . . . .

Defendants exercised control over the Plaintiffs' property and deprived the Plaintiffs of their property by giving the property to the family members of the Defendants and selling it to FASMA. At the time the Defendants gave the property of the Plaintiffs to their family members and FASMA, they knew that the property did not belong to them and that their actions would deprive the Plaintiffs of their property.

(ECF No. 11, at ¶¶ 92–94.)

46.    Defendants contend that the conversion claim should be dismissed because the Amended Complaint fails to clearly allege (a) who is the legal owner of the Dunn Foot equipment (Dunn Foot or Daughtry); (b) when any conversion of the Dunn Foot equipment took place; (c) who is alleged to have exercised control of the Dunn Foot equipment (Nolan, Hauser, or Piedmont); and (d) how any alleged conversion of income and profits would be attributable to Nolan or Hauser rather than Piedmont itself—given the nature of the acts of conversion alleged in the Amended Complaint. (ECF No. 17, at pp. 11–14.)

47. The Court concludes that the conversion claim, as currently pled, is impermissibly vague. It is difficult to tell which of the Plaintiffs is alleged to actually own the specific property forming the basis for this claim. It is likewise hard to discern from Plaintiffs' allegations the precise acts of conversion being alleged, when those acts occurred, and whether they were effectuated by the Defendants or Piedmont.

48. Therefore, Defendants' Motion to Dismiss is GRANTED as to Plaintiffs' claim for conversion, and this claim is DISMISSED without prejudice.

E. UDTP

49. Plaintiffs also allege a claim for UDTP under the North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1.1 *et seq*. ("UDTPA"). (ECF No. 11, at ¶¶ 101–05.)

50. To successfully state a UDTP claim, a plaintiff must allege "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." *Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 71–72 (2007) (quoting *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 68 (2000)).

51. In seeking dismissal of Plaintiffs' UDTP claim, Defendants focus solely on the second element, arguing that the claim should be dismissed because Plaintiffs' allegations of unfair and deceptive conduct are not "in or affecting commerce" in that the Amended Complaint "arises completely within the corporate dealings of Piedmont[.]" (ECF No. 17, at pp. 15–16.) Conversely, Plaintiffs contend that the conduct alleged did, in fact, affect commerce because it involved "multiple companies,

multiple persons, patients and even public sporting event payments."[8] (ECF No. 23, at p. 17.)

52.    Our Supreme Court has stated that despite the expansive definition of commerce contained in Chapter 75, "the [UDTPA] is not focused on the internal conduct of individuals within a single market participant, that is, within a single business." *White v. Thompson*, 364 N.C. 47, 53 (2010) (holding that defendant's conduct fell outside the scope of the UDTPA where he "unfairly and deceptively interacted only with his partners" and where "his conduct occurred completely within the . . . partnership"); *see also Alexander v. Alexander*, 250 N.C. App. 511, 515 (2016) (holding that defendant's misappropriation of corporate funds "for the benefit of himself and his family members are more properly classified as the misappropriation of funds within a single entity rather than commercial transactions between separate market participants 'in or affecting commerce' ").

53.    On several occasions, this Court has dismissed UDTP claims on this ground. *See, e.g., Poluka v. Willette*, 2021 NCBC LEXIS 105, at **13–21 (N.C. Super. Ct. Dec. 2, 2021) (dismissing UDTP claim where allegations of majority member's "improper payments" to family members and wrongful acts regarding LLC's management were "simply another example of an internal dispute between members of a single company"); *Botanisol Holdings II, LLC v. Propheter*, 2021 NCBC LEXIS 94, at **24–28 (N.C. Super. Ct. Oct. 18, 2021) (dismissing UDTP claim where

---

[8] In the Amended Complaint, Plaintiffs allege that Defendants' wrongful "acts and omissions" are "in and affecting commerce in that multiple businesses were involved." (ECF No. 11, at ¶ 102.)

allegations of member's diversion of opportunities away from original LLC to his new LLC were not "in or affecting commerce" because "the focus of the deception was on [the original entity]"); *Potts v. KEL, LLC*, 2018 NCBC LEXIS 24, at **12–16 (N.C. Super. Ct. Mar. 27, 2018) (dismissing UDTP claim where allegations of shareholder's funneling of money belonging to corporation toward entities owned by the shareholder and his family were not "in or affecting commerce" because "the unfairness of these actions, if any, inheres in the relationship between [the plaintiff and defendant] as *co-owners* of" a single market participant); *JS Real Estate Invs. LLC v. Gee Real Estate, LLC*, 2017 NCBC LEXIS 104, *17–22 (N.C. Super. Ct. Nov. 9, 2017) (dismissing UDTP claim where "[b]y its nature, th[e] dispute [did] not concern the regular interactions of separate market participants" but rather involved the members' dispute "over the companies' internal management and the members' right to receive distributions.").

54.     Plaintiffs attempt to rebut Defendants' argument on this issue by stating the following in their brief in opposition to Defendants' Motion to Dismiss:

> In *Sara Lee* [*Corp. v. Carter*, 351 N.C. 27 (1999)], the Court noted the importance of the role that pricing has in the marketplace. Here, the same logic applies. Piedmont is a consumer/patient driven business. Expense of such business will necessarily impact prices to the consumer/patient. Illegitimate expenses passed along to Plaintiffs, which would necessarily come in to play in assessing charges to consumers/patient[s], thereby clearly bringing the matter within the commerce prong for UDTP claims. Furthermore, you would also necessarily have an interaction with health insurers. Lastly, you also have the interaction and effect on the purchase price and negotiation with three distinct companies who purchased Piedmont.

(ECF No. 23, at pp. 16–17.)

55. The Court is unpersuaded by Plaintiffs' argument. As in the cases cited above, the Court similarly concludes that the wrongful acts alleged by Plaintiffs here primarily relate to an internal business dispute between shareholders of a single corporation such that they have not alleged conduct "in or affecting commerce" within the meaning of the UDTPA. The essence of Plaintiffs' allegations is that Defendants authorized improper payments from Piedmont to themselves and their family members, inflated Piedmont's expenses, and withheld money and assets belonging to Plaintiffs.

56. As noted above, Plaintiffs' main argument as to why Defendants' alleged conduct was "in or affecting commerce" is that their acts had indirect consequences outside the company on patients and consumers. "The Supreme Court's refusal in *White* to allow indirect involvement of other market participants to trigger liability under Section 75-1.1 forecloses [this] argument." *Powell v. Dunn*, 2014 NCBC LEXIS 3, at **10–11 (N.C. Super. Ct. Jan. 28, 2014); *see White*, 346 N.C. at 54 (rejecting plaintiffs' argument that defendant's internal conduct was "in or affecting commerce" because it indirectly "reduc[ed] competition and potentially affect[ed] prices in the market"); *see also LLG-NRMH, LLC v. Northern Riverfront Marina & Hotel, LLLP*, 2018 NCBC LEXIS 105, at *13 (N.C. Super. Ct. Oct. 9, 2018) (finding allegations of defendants' *indirect* harm to the "broader marketplace" insufficient to support a UDTP claim). Moreover, although Plaintiffs are correct that the Amended Complaint references third-party entities that acquired Piedmont, the mere mention of these other entities does not alter the fundamental character of this case, as the allegedly

unfair conduct does not directly involve those entities. *See JS Real Estate Invs. LLC*, 2017 NCBC LEXIS 104, at \*21; *Bandy v. Gibson*, 2017 NCBC LEXIS 66, at \*21–22 (N.C. Super. Ct. July 26, 2017).

57. Accordingly, the Court finds that Plaintiffs have failed to adequately allege conduct that is "in or affecting commerce." Therefore, the Court concludes that Defendants' Motion to Dismiss is GRANTED as to Plaintiffs' claim for UDTP, and this claim is DISMISSED without prejudice.

## F. Fraud

58. The Amended Complaint further alleges a claim for fraud. (ECF No. 11, at ¶¶ 106–10.) Under North Carolina law, the essential elements of a claim for fraud are: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Terry v. Terry*, 302 N.C. 77, 83 (1981) (quoting *Ragsdale v. Kennedy*, 286 N.C. 130, 138 (1974)).

59. Defendants contend that the fraud claim should be dismissed because Plaintiffs' allegations do not satisfy the heightened pleading requirement for such claims as required by Rule 9(b) of the North Carolina Rules of Civil Procedure. (ECF No. 17, at pp. 16–20.)

60. Rule 9(b) requires that "the circumstances constituting fraud" be alleged "with particularity." N.C. R. Civ. P. 9(b). "The purpose of Rule 9(b) is to provide a defendant with sufficient notice of the fraud alleged 'in order to meet the charges.' " *Provectus Biopharm., Inc. v. RSM US LLP*, 2018 NCBC LEXIS 101, at \*63 (N.C.

Super. Ct. Sept. 28, 2018) (quoting *Terry*, 302 N.C. at 85). Our Supreme Court has held that "in pleading actual fraud[,] the particularity requirement is met by alleging time, place[,] and content of the fraudulent representation, identity of the person making the representation[,] and what was obtained as a result of the fraudulent acts or representations." *Terry*, 302 N.C. at 85. Thus, "a pleading is sufficiently particular 'if, upon a liberal construction of the whole pleading, the charge of fraud might be supported by proof of the alleged constitutive facts.'" *Provectus Biopharm., Inc.*, 2018 NCBC LEXIS 101 at *63 (quoting *Carver v. Roberts*, 78 N.C. App. 511, 513 (1985)).

61. Here, the Amended Complaint contains general allegations that "Defendants" made "false and intentionally misleading statements" on "multiple occasions" to "Plaintiffs" during periods spanning up to three years. (ECF No. 11, at ¶¶ 107(a)–(i).) However, as with Plaintiffs' conversion claim, these fraud allegations are vague—particularly with regard to who made the statements, to whom the statements were made, the substance of the statements, and the dates the statements were made. Accordingly, the Court finds that Plaintiffs have inadequately pled their fraud claim with particularity, as required by Rule 9(b).

62. Therefore, Defendants' Motion to Dismiss is GRANTED as to Plaintiffs' claim for fraud, and this claim is DISMISSED without prejudice.

G. Civil Conspiracy

63. Finally, the Amended Complaint includes a claim for civil conspiracy. (ECF No. 11, at ¶¶ 77–83.) Our Supreme Court has held that "a complaint sufficiently states a claim for civil conspiracy when it alleges (1) a conspiracy, (2)

wrongful acts done by certain of the alleged conspirators in furtherance of that conspiracy, and (3) injury as a result of that conspiracy." *Krawiec v. Manly*, 370 N.C. 602, 614 (2018) (cleaned up). A claim for civil conspiracy is not a standalone claim and therefore "must be based on an adequately pled underlying claim." *USA Trouser, S.A. de C.V. v. Williams*, 258 N.C. App. 192, 201 (2018); *see Krawiec*, 370 N.C. at 615 (dismissing civil conspiracy claim where the underlying claims were dismissed).

64. Defendants contend that Plaintiffs' civil conspiracy claim should be dismissed because (a) Plaintiffs "failed to adequately plead that an agreement existed between the Defendants"; and (b) if the Court accepts Defendants' arguments for dismissal of all other claims in the Amended Complaint, there will be no underlying claim left to serve as the basis for the civil conspiracy claim. (ECF No. 17, at p. 11.)

65. With regard to Defendants' first argument, our Supreme Court has stated that "[a] party may prove an action for civil conspiracy by circumstantial evidence[.]" *Dalton v. Camp*, 138 N.C. App. 201, 213 (2000) (cleaned up) (citing *Dickens v. Puryear*, 302 N.C. 437, 456 (1981)). Here, the Amended Complaint contains allegations that, since 2017, Defendants Nolan and Hauser—as majority shareholders and officers of Piedmont—had meetings, conversations, and other communications in which they developed a "plan or scheme" to deny Plaintiffs from receiving a fair share of profits and income from Piedmont. (ECF No. 11, at ¶¶ 67, 79–80.) These statements, taken as true as is required under Rule 12(b)(6), sufficiently allege that an agreement existed between the Defendants to engage in unlawful conduct toward Plaintiffs. Indeed, this Court has recognized that "it is

difficult to dismiss a conspiracy claim summarily because the elements of a conspiracy claim are broadly stated." *Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, 2015 NCBC LEXIS 40, at *48 (N.C. Super. Ct. Apr. 23, 2015). While Plaintiffs will ultimately bear the burden of *proving* that a conspiracy did, in fact, exist, the Court finds these allegations sufficient at the pleadings stage.

66. As for Defendants' second argument, although Defendants are correct that a claim for civil conspiracy is not a standalone claim, the Court—as discussed above—is denying Defendants' Motion to Dismiss as to Plaintiffs' breach of fiduciary duty claim. This Court has previously allowed a civil conspiracy claim predicated on a breach of fiduciary duty claim to survive a motion to dismiss. *See, e.g., Veer Right Mgmt. Grp., Inc. v. Czarnowski Display Serv.*, 2015 NCBC LEXIS 13, **9–11 (N.C. Super. Ct. Feb. 4, 2015); *GoRhinoGo, LLC v. Lewis*, 2011 NCBC LEXIS 39, at *20 (N.C. Super. Ct. Sept. 29, 2011).

67. Therefore, Defendants' Motion to Dismiss is DENIED as to Plaintiffs' claim for civil conspiracy.

## CONCLUSION

**THEREFORE, IT IS ORDERED** that Defendants' Motion to Dismiss is **GRANTED**, in part, and **DENIED**, in part, as follows:

1. The Motion is **GRANTED** with respect to the following claims, which are dismissed without prejudice:

    a. Plaintiffs' claim for breach of contract;

b. Plaintiffs' claim for breach of the covenant of good faith and fair dealing;

c. Plaintiffs' claim for conversion;

d. Plaintiffs' claim for UDTP; and

e. Plaintiffs' claim for fraud.

2. The Motion is **DENIED** with respect to the following claims:

a. Plaintiffs' claim for civil conspiracy; and

b. Plaintiffs' claim for breach of fiduciary duty.

3. The Motion is **DENIED** as **MOOT** to the extent it seeks dismissal of any derivative claims contained in the Amended Complaint.

4. Plaintiffs shall have **thirty (30) days** in which to file a Second Amended Complaint if they desire to do so.[9]

SO ORDERED, this the 19th day of July, 2022.

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge
for Complex Business Cases

---

[9] In the event that Plaintiffs elect to file a Second Amended Complaint, they are directed to state their claims with greater clarity than that existing in the Amended Complaint currently before the Court.